**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**,<br><br>       Plaintiff,<br><br>   v.<br><br>**CENTER ONE, LLC**,<br><br>       Defendant. | Case No. 2:19-cv-1242-DSC<br><br>Hon. David Stewart Cercone |

## <u>PLAINTIFF EEOC'S RESPONSE TO DEFENDANT'S<br>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>

Plaintiff U.S. Equal Employment Opportunity Commission (EEOC) hereby files this Response to Defendant Center One, LLC's (Defendant) Motion to Dismiss Plaintiff's Complaint (ECF No. 7) in the above-styled and numbered action.

## INTRODUCTION

Defendant's Motion to Dismiss EEOC's Complaint with prejudice is meritless and should be denied. In its Motion, Defendant makes only two arguments. First, it argues that EEOC has not stated a claim that Defendant took an adverse employment action against Charging Party Demetrius Ford, which pleading deficiency it argues vitiates EEOC's failure-to-reasonably-accommodate-religion claim under Title VII of the Civil Rights Act of 1964 (Title VII). But contrary to Defendant's assertion, EEOC has sufficiently pleaded that Defendant constructively discharged Ford and subjected him to disciplinary points that materially affected his status as an employee by moving him multiple steps closer to termination under Defendant's progressive-disciplinary policy. As alleged, that conduct constitutes adverse employment actions under Title VII. Moreover,

as the Third Circuit has stated, the denial of a religious accommodation is in and of itself an un-lawful employment practice and adverse action under Title VII, rendering the pleading of another adverse action unnecessary to state a claim for denial of reasonable accommodation of religion.

Second, regarding EEOC's constructive-discharge claim, Defendant argues that EEOC has not stated a claim that Ford's working conditions had become so intolerable that a reasonable person in his position would have felt compelled to resign. However, taken as true for purposes of Defendant's Motion, EEOC's allegations are more than sufficient to show that Defendant placed Ford in an intolerable situation that required him to choose between his job and adhering to the requirements of his faith, which allegations this Court and many others have found sufficient to establish objectively intolerable working conditions. EEOC's allegations also sufficiently plead that a reasonable person in Ford's position would have concluded that he would inevitably be discharged by Defendant, which again, the federal courts have consistently held is sufficient to establish a constructive discharge. Thus, in accordance with Third Circuit caselaw and well-estab-lished claim-pleading standards, EEOC has adequately pleaded that Defendant both constructively discharged Ford and took at least two further adverse employment actions against him.

## STATEMENT OF FACTS

Demetrius Ford is an adherent of Messianic Judaism. ECF No. 1 ¶ 15 (EEOC's Compl.). He sincerely held and practiced this religious faith throughout his employment at Defendant. *Id.* Pursuant to his faith, he sincerely holds the religious belief that he is not permitted to work on certain religious holidays that Messianic Jews observe. *Id.* ¶ 16.

Ford informed Defendant on multiple occasions, both before his hire and during his em-ployment, that he is a Messianic Jew and that because of his sincerely held religious beliefs, he cannot work on certain religious holidays. *Id.* ¶¶ 17–18, 23–26, 28, 40. He did so at his

preemployment interview with Heather Altman, a human-resources official at Defendant, *id.* ¶ 18; when Human Resources Generalist Andrea Robel directed him to provide a formal clergy or religious-organization certification for any religious holidays for which he was requesting time off, *id.* ¶¶ 23–26; at the Employee Review Committee (ERC) meeting to discuss his absences from work, *id.* ¶ 28; and when he told Altman that he intended to resign, *id.* ¶ 40.

Ford began working for Defendant on September 12, 2016. *Id.* ¶ 14. In 2016, Rosh Hashanah and Yom Kippur fell on October 3 and 4 and October 12, respectively. *Id.* ¶¶ 20, 31–32. Both are religious holidays that Ford observes as a Messianic Jew. *Id.* In observance of Rosh Hashanah, Ford did not attend work and called Defendant's attendance hotline to report his absence but was nevertheless assessed points under Defendant's attendance and progressive-discipline policy. *Id.* ¶¶ 20–21. When he returned to work on October 5, he submitted a Temporary Schedule Change (TSC) form seeking to modify his schedule on October 11, in view of Yom Kippur beginning at sundown on the 11th and continuing on October 12. *Id.* ¶ 22.

After Ford submitted the TSC form, Robel directed him to provide "documentation from his religious congregation 'on letterhead' confirming the dates of any upcoming religious holidays for which he was requesting time off," which demand she made pursuant to Defendant's policy or practice. *Id.* ¶¶ 23–24. Ford attempted to obtain the requested documentation, but he was unable to do so because he was not a member of a congregation at that time and his prior congregation had dissolved, so instead, he provided Robel with three religious calendars and an email chain between him and the leader of a Messianic Jewish congregation that he was considering joining. *Id.* ¶¶ 25–26.

On October 12, which was Yom Kippur, Ford participated in an ERC meeting that began with Vice President of Human Resources Patti Sue O'Malley asking him, "Are you sure that you

can show up today?"[1] *Id.* ¶ 28. During the ERC meeting, Ford again explained his religious beliefs and observance of religious holidays while O'Malley told him that the documents he had provided were insufficient, that he needed to provide the requested letterhead, and that he could not take any more days off for any reason. *Id.* ¶¶ 28–30. Since he did not work that day, Defendant assessed him another absence point under its progressive-discipline policy. *Id.* ¶ 33. One more absence point would have subjected him to termination. *Id.*

On October 19, Ford informed Altman that he planned to resign at the end of the week. *Id.* ¶ 39. He told her that there were more Jewish holidays soon and that he knew Defendant would terminate him if he took time off to observe them. *Id.* ¶ 40. Altman did not disagree with Ford's assessment or try to convince him to stay but, rather, reiterated Defendant's demand that he obtain certification from his congregation of the religious holidays for which he was requesting time off. *Id.* Altman then told Ford to continue working while she prepared the necessary paperwork and several minutes later returned and told him that Defendant had terminated him, that he could not work for the remainder of the week, and that he needed to leave immediately. *Id.* ¶ 41.

## ARGUMENT

Federal Rule of Civil Procedure 8(a)(2) requires that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In turn, the well-settled standard of review for a motion to dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) "requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Laurel Mgmt. Grp., LLC v. White Sheep Corp.*, No. 2:18-cv-1000, 2019 WL 4597745, at *1 (W.D.

---

[1] One reasonable inference that can be drawn in the context of O'Malley's other conduct at the meeting is that her question to Ford was an expression of sarcasm.

Pa. Sept. 23, 2019) (quoting *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989)). Under the Supreme Court's decisions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), to survive a motion to dismiss, a claim need only be "plausible on its face," as these decisions do not impose a probability standard at the pleading stage. *E.g.*, *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678; *Laurel Mgmt. Grp.*, 2019 WL 4597745, at *1. Finally, EEOC is not required to plead a prima facie case of discrimination in order to survive a motion to dismiss. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–12 (2002); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009); *Israel v. Insight Pipe Contracting, LP*, No. 12-cv-1247, 2013 WL 2318852, at *4 (W.D. Pa. May 28, 2013).[2]

**I.   EEOC has adequately pleaded that Defendant subjected Ford to adverse employment actions in the form of constructive discharge and progressive discipline.**

Title VII prohibits an employer from discharging or otherwise discriminating against an employee with respect to his compensation, terms, conditions, or privileges of employment because of his religion. 42 U.S.C. § 2000e–2(a). Title VII defines *religion* as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). Accordingly, Title VII prohibits employers from denying reasonable accommodations of employees' religious beliefs, practices, or observances and creates a cause of action for employees who have

---

[2] EEOC notes that Defendant's request that the Court dismiss EEOC's Complaint with prejudice is contrary to controlling law. Even if Defendant's Motion were otherwise meritorious, EEOC would be afforded leave to file an amended complaint to address any claimed pleading deficiency. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008); *Flood v. Sherk*, 400 F. Supp.3d 295, 305 (W.D. Pa. 2019).

been denied such accommodation. *See Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 281, 281 n.12 (3d Cir. 2001).

To state a prima facie case of failure to reasonably accommodate an employee's religion under Title VII, EEOC's Complaint should reflect facts and reasonable inferences supporting three elements: (1) Ford held a sincere religious belief that conflicted with a job requirement; (2) he informed Defendant of this conflict; and (3) Defendant disciplined him for failing to comply with the conflicting job requirement. *See Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009); *see also Kaite v. Altoona Student Transportation, Inc.*, 296 F. Supp.3d 736, 740 (W.D. Pa. 2017) (same). As stated above, although EEOC is not required to affirmatively plead a prima facie case of discrimination in order to survive a motion to dismiss, consistent with *Twombly* and *Iqbal*, if EEOC has pleaded a plausible prima facie case of discrimination, its Complaint is more than sufficient to survive a motion to dismiss. *Cf. Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1050 n.2 (9th Cir. 2012) ("Nevertheless, in situations such as this, where a plaintiff pleads a plausible prima facie case of discrimination [under the Age Discrimination in Employment Act of 1967 (ADEA)], the plaintiff's complaint will be sufficient to survive a motion to dismiss.").

Defendant does not challenge the adequacy with which EEOC has pleaded the first and second elements of its reasonable-accommodation claim. Rather, Defendant only challenges the adequacy with which EEOC has pleaded the third element, i.e., that Defendant disciplined Ford for failing to comply with a job requirement that conflicted with his sincere religious belief. *See* ECF No. 8 at 5–8 (Def.'s Brief in Support of Def.'s Mot. for Partial Dismissal). Defendant's challenge falls short because, as EEOC has pleaded, Defendant subjected Ford to multiple adverse employment actions, including constructive discharge, progressive discipline, and denial of reasonable accommodation of religion.

A.      **Defendant acknowledges that a constructive discharge is an adverse employ-
ment action under Title VII.**

The third element of EEOC's prima facie case, i.e., discipline, is a common manifestation

in this context of the more general adverse-employment-action requirement under § 703(a) of Title

VII, 42 U.S.C. § 2000e–2(a), and thus, a constructive discharge arising from an employer's failure

to reasonably accommodate religion satisfies the discipline element. *See, e.g.*, *Mohammed v.

Schneider Nat'l Carriers, Inc.*, No. 18-cv-0642, 2018 WL 5634897, at *2 (W.D. Pa. Oct. 12,

2018), *report and recommendation adopted*, No. 2:18-cv-0642, 2018 WL 5633994 (W.D. Pa. Oct.

31, 2018).

In its Motion to Dismiss, Defendant acknowledges, as it must, that a constructive discharge

is an adverse employment action sufficient to state a claim under Title VII. *See* ECF No. 8 at 5

("Examples of adverse employment actions include . . . circumstances amounting to constructive

discharge."). Constructive discharge is a well-established adverse employment action in the con-

text of failure-to-reasonably-accommodate-religion claims and Title VII claims generally. *See,

e.g.*, *Pennsylvania State Police v. Suders*, 542 U.S. 129, 142–43 (2004) (holding that constructive

discharge is a "constructive alteration[] in the terms or conditions of employment" and that "Title

VII encompasses employer liability for a constructive discharge"); *see also EEOC v. CONSOL

Energy, Inc.*, 860 F.3d 131, 143 (4th Cir. 2017) (endorsing district court's holding that constructive

discharge constituted adverse employment action for failure-to-reasonably-accommodate-religion

claim), *cert. denied sub nom. CONSOL Energy Inc. v. EEOC*, 138 S. Ct. 976 (2018); *Hurtt v. Int'l

Servs., Inc.*, 627 F. App'x 414, 420 (6th Cir. 2015) ("[A]lthough already well established, we hold

once more today that a plaintiff may use a constructive discharge claim to show that he or she has

suffered an adverse employment action."); *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 928

(8th Cir. 2004) ("[C]onstructive discharge is but one incident by which an employee can

demonstrate an adverse action."); *Ellingsworth v. Hartford Fire Ins. Co.*, 247 F. Supp.3d 546, 556 (E.D. Pa. 2017) ("A constructive discharge constitutes an 'adverse employment action' for purposes of Title VII—if proven, it is the legal equivalent of being terminated.").

**B.      As pleaded, EEOC's Complaint states a claim for constructive discharge because of religion.**

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). To state a claim of constructive discharge, EEOC's Complaint must reflect facts and any reasonable inferences that could be drawn in EEOC's favor that indicate the presence of two elements: (1) Defendant discriminated against Ford to the point where his working conditions became so intolerable that a reasonable person in his position would have felt compelled to resign, and (2) Ford actually resigned because of those working conditions. *See id.* at 1777; *see also Lewis v. Univ. of Pennsylvania*, 779 F. App'x 920, 922 (3d Cir. 2019) (same). An objective standard governs whether Ford's working conditions had become sufficiently intolerable that a reasonable person in his position would have felt compelled to resign. *See Suders*, 542 U.S. at 141; *Lewis*, 779 F. App'x at 922. This standard focuses on the objective intolerability of his working conditions and does not require EEOC to show that Defendant acted with the specific intent to cause Ford's constructive discharge. *See Suders v. Easton*, 325 F.3d 432, 444 (3d Cir. 2003) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 88 (3d Cir. 1984)) ("We hold that no finding of a specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine. The court need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person

8

subject to them would resign."), *vacated on other grounds sub nom. Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004); *McIlmail v. Pennsylvania*, 381 F. Supp.3d 393, 411–12 (E.D. Pa. 2019) (same); *see also Green*, 136 S. Ct. at 1788 (Alito, J., concurring in judgment) ("It is abundantly clear that the majority has abandoned the discriminatory-intent requirement . . . ."); *Suders*, 542 U.S. at 147–48 (focusing on intolerability of conditions, not employer's scienter).

Defendant does not challenge the adequacy with which EEOC has pleaded the second element of its constructive-discharge claim, i.e., that Ford actually resigned from Defendant because of his working conditions. Rather, Defendant only challenges the adequacy with which EEOC has pleaded the first element, i.e., that Ford's working conditions had become so intolerable that a reasonable person in his position would have felt compelled to resign. *See* ECF No. 8 at 8–9. Defendant's challenge is meritless for at least three reasons.

**1. EEOC's Complaint reflects that Defendant subjected Ford to objectively intolerable working conditions because Defendant required Ford to choose between avoiding discipline/discharge and practicing his religion.**

In its Complaint, EEOC states that Defendant refused to provide Ford with a religious accommodation unless he tendered a formal clergy or religious-organization certification that Defendant knew he could not obtain. In doing so, Defendant created an inextricable dilemma that required Ford to choose between, on the one hand, avoiding disciplinary action and discharge and, on the other hand, practicing his religion. Irrespective of other extraneous factors, this Court and many other courts have held that such facts are enough to plead objectively intolerable working conditions supporting a constructive-discharge claim.

For example, in *Yochum v. FJW Inv., Inc.*, No. 2:11-cv-0378, 2016 WL 1255289 (W.D. Pa. Mar. 31, 2016), this Court denied the defendant-employer's motion for summary judgment on the plaintiff-former employee's Title VII religious-discrimination claim, holding that a genuine

dispute of material fact existed about whether the employer had constructively discharged the plaintiff when a co-owner had directed her to continue participating in religiously themed training sessions, after the plaintiff had expressed her objections to the religious aspects, or lose her job. *Id.* at *4–6. Citing caselaw both inside and outside the Third Circuit, this Court concluded, "Courts have routinely held that such a choice represents a constructive discharge." *Id.* at *6.

In *Mathis v. Christian Heating & Air Conditioning, Inc.*, 158 F. Supp.3d 317 (E.D. Pa. 2016), another district court in the Third Circuit denied the defendant-employer's motion for summary judgment on the plaintiff-former employee's multiple Title VII religious-discrimination claims. *Id.* at 336. Based on his beliefs as an atheist, the plaintiff expressed his objections to wearing a nametag bearing a religious message. *Id.* at 335. The district court denied the employer's motion for summary judgment, holding, "A reasonable jury could conclude that plaintiff communicated his religious-based objection to displaying the mission statement, and that [defendant] gave him a Hobson's choice between continuing to work under conditions that offended plaintiff's beliefs or ending his employment. That evidence, if accepted by a jury, constitutes a constructive discharge." *Id.*

Similarly, in *Shepherd v. Gannondale*, No. 1:14-cv-0008, 2014 WL 7338714 (W.D. Pa. Dec. 22, 2014), this Court denied the defendant-employer's motion for summary judgment on the plaintiff-former employee's multiple Title VII religious-discrimination claims. *Id.* at *21. This Court held that the record was sufficient to support an adverse employment action of either termination or constructive discharge where the employer had learned that the plaintiff was a Jehovah's Witness and held a religious belief that conflicted with a job requirement, thereafter failed to excuse the plaintiff from that job requirement, and then set into motion events that would result in her termination. *Id.* at *15. Regarding the constructive discharge, this Court held that the record

was sufficient to support it where the plaintiff "resigned . . . just before she would have been terminated." *Id.*

Courts in other circuits have also held that inextricable dilemmas where employers required employees to choose between retaining their jobs, on the one hand, and honoring their sincerely held religious beliefs, on the other hand, indicate objectively intolerable working conditions supporting constructive-discharge claims. *See, e.g.*, *Campos v. City of Blue Springs, Missouri*, 289 F.3d 546, 550–51 (8th Cir. 2002) (holding that jury had sufficient evidence to find that "[former supervisor] made it nearly impossible for [appellee-former employee] to attend the dissertation meetings because she wanted to replace [former employee] with a Christian employee," that "[former employee's] resignation was a foreseeable consequence of [former supervisor's] actions," and that appellant-employer had constructively discharged former employee because she was not Christian); *EEOC v. CONSOL Energy, Inc.*, No. 1:13-cv-0215, 2015 WL 106166, at *7–8 (N.D.W. Va. Jan. 7, 2015) (denying parties' cross-motions for summary judgment on EEOC's Title VII religious-discrimination claim, holding that genuine dispute of material fact existed about whether defendant-employer constructively discharged former employee where he retired after implementation of hand-scanning policy to which he expressed religious objections, and where EEOC contended that employer failed to provide reasonable accommodation for religion); *EEOC v. Townley Eng'g & Mfg. Co.*, 675 F. Supp. 566, 569–70 (D. Ariz. 1987) (denying defendant-employer's motion for summary judgment on EEOC's Title VII religious-discrimination claim, holding that genuine dispute of material fact existed about whether employer constructively discharged former employee after it required him to attend devotional services over his expressed objections, and where "[former employee] was not overtly disciplined for his objection to the devotional services"), *aff'd in part*, *rev'd in part*, 859 F.2d 610 (9th Cir. 1988).

EEOC's Complaint alleges that Defendant placed Ford in the same kind of no-win situation that the above-cited courts have held to be sufficiently plead or demonstrate objectively intolerable working conditions. As alleged, Ford is an adherent of Messianic Judaism and told Defendant that because of his religious beliefs and practices, he is not permitted to work on certain religious holidays. ECF No. 1 ¶¶ 15–17. Before it would excuse him from work on those religious holidays as a religious accommodation, Defendant directed him to submit "documentation from his religious congregation 'on letterhead' confirming the dates of any upcoming religious holidays for which he was requesting time off." *Id.* ¶ 23. Ford could not obtain the requested documentation, in part, because he was not a member of a congregation at that time, and he informed Defendant of that fact but provided other documents confirming the dates of upcoming religious holidays, which documents Defendant rejected as insufficient. *See id.* ¶¶ 25–26, 29, 36, 42.

Without the official letterhead certification in hand, Defendant issued Ford disciplinary points for his observance of religious holidays, which disciplinary points placed him at imminent risk of termination, and Defendant's Vice President of Human Resources Patti Sue O'Malley forbade Ford from taking any further days off. *See id.* ¶¶ 21, 30, 33, 35. With more religious holidays in the near future and no way to obtain a religious accommodation from Defendant, Ford faced an inextricable dilemma: he could observe his religious holidays in defiance of O'Malley, which would place him at immediate risk of termination for violating Defendant's attendance policy or subject him to termination for violating her order, or he could attend work on religious holidays and betray his religious obligations. *See id.* ¶¶ 40, 42. Accepting all allegations in EEOC's Complaint as true and drawing all reasonable inferences from those allegations in EEOC's favor, EEOC's Complaint allegations are more than sufficient to state a claim of objectively intolerable working conditions establishing a constructive discharge.

**2.      EEOC's Complaint reflects that Defendant subjected Ford to objectively in-tolerable working conditions because a reasonable person in his circumstances would have concluded that his firing resulting from a lack of religious accommodation was inevitable.**

Defendant's argument fails to acknowledge that the facts pleaded in EEOC's Complaint and all reasonable inferences that may be drawn therefrom, if credited, would cause a reasonable person in Ford's circumstances to conclude that his discharge was inevitable due to Defendant's refusal to provide a religious accommodation.

The constructive-discharge doctrine's *raison d'être* is its recognition that an employee suffering objectively intolerable working conditions may resign his employment before his employer executes the ultimate adverse employment action—termination. *See, e.g.*, *EEOC v. Univ. of Chicago Hosp.*, 276 F.3d 326, 332 (7th Cir. 2002) (reversing grant of summary judgment to appellee-employer on EEOC's Title VII religious-discrimination claim, holding that genuine dispute of material fact existed about whether employer constructively discharged former employee where "[t]his environment, in which her employer made reasonably clear to her that she had reached the end of the line—where 'the handwriting [was] on the wall' and the axe was about to fall . . . — could have indeed been to a reasonable employee unbearable").

As such, courts have long found that a constructive discharge occurs where a reasonable person would conclude under the circumstances that his firing was inevitable. As the Fifth Circuit aptly summarized in a similar Title VII religious-discrimination case:

> The only possible reason for her resignation on September 15, 1971, was her resolution not to attend religious services which were repugnant to her conscience, coupled with the certain knowledge from Bostain, her supervisor, that attendance at the staff meetings—in their entirety—was mandatory and the reasonable inference that if she would not perform this condition of her employment, she would be discharged. In these circumstances, when she could hope no longer that her absence at the meetings would not be noticed, she could reasonably infer that in one week, one month or two months, she would be discharged because of the conflict between her religious beliefs and company policy. Surely it would be too nice a distinction

> to say that Mrs. Young should have borne the considerable emotional discomfort of waiting to be fired instead of immediately terminating her association with Southwestern. This is precisely the situation in which the doctrine of constructive discharge applies, a case in which an employee involuntarily resigns in order to escape intolerable and illegal employment requirements.

*Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975). Notably, the employer in *Young* never threatened to terminate the plaintiff before she resigned. *See id.* at 142.

The federal courts have consistently held that a constructive discharge occurs where a reasonable person would conclude under the circumstances that his or her firing was inevitable. *See, e.g.*, *Laster v. City of Kalamazoo*, 746 F.3d 714, 728–29 (6th Cir. 2014) ("[C]onstructive discharge also occurs where, based on an employer's actions, 'the handwriting was on the wall and the axe was about to fall.'"); *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998) ("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired."); *Stephens v. C.I.T. Grp./Equip. Fin., Inc.*, 955 F.2d 1023, 1028–29 (5th Cir. 1992) (affirming jury's finding of constructive discharge where appellant-employer's actions after demoting appellee-former employee "could make a reasonable employee believe that he risked termination if he remained on the job"); *Lopez v. S.B. Thomas, Inc*., 831 F.2d 1184, 1188–89 (2d Cir. 1987) (reversing grant of summary judgment to appellee-employer on appellant-former employee's constructive-discharge claim, holding that genuine dispute of material fact existed about whether employer constructively discharged former employee where former supervisor told former employee that he would be fired at end of 90-day probationary period regardless of performance); *cf. EEOC v. CONSOL Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017) ("[W]e do not think that the future prospect of a successful grievance under a collective bargaining agreement . . . would do anything to alleviate the immediate intolerability of [former employee's] circumstances."), *cert. denied sub nom. CONSOL Energy Inc. v. EEOC*, 138 S. Ct. 976 (2018).

Here, Defendant inaccurately asserts that EEOC's allegations merely suggest that Ford had a subjective and unreasonable fear that Defendant might terminate him at some undetermined point in the future, *see* ECF No. 8 at 8–9, but that mischaracterization attempts to diminish the gravity of Ford's predicament, as EEOC has alleged it. Ford informed Defendant that he could not provide the formal certification that it had requested and instead provided multiple other documents showing his religious holidays. ECF No. 1 ¶ 26. The following week, Defendant held an ERC meeting with Ford to discuss his absences from work. Notwithstanding that Ford had already informed Defendant that he was unable to obtain a formal certification, Defendant's vice president of human resources, O'Malley, told Ford that his alternative documents were insufficient, reiterated the demand that he provide a formal certification that Defendant knew he could not provide, and forbade him from taking any more days off for any reason. *Id.* ¶¶ 28–30. This fact alone—an unambiguous directive from a corporate officer to refrain from taking more days off, including for upcoming required religious observance, unless and until Ford satisfied an impossible precondition—is more than sufficient to establish that a rational person would conclude that his firing was forthcoming. And adding further insult to injury, O'Malley began the meeting with sarcasm. *Id.* ¶¶ 27–28, 31.

More Jewish holidays were scheduled to occur soon following the ERC meeting. *Id.* ¶¶ 31, 40. So the next week, Ford told Altman that he intended to resign because "there were more Jewish holidays soon and . . . he knew Defendant would discharge him if he took time off to observe those holidays." *Id.* ¶ 40. Altman did not deny that Defendant would discharge him if he took additional time off to observe religious holidays or try to stop him from resigning. *Id.* ¶¶ 40–41. Instead, she reiterated Defendant's precondition that he provide a formal clergy or religious-organization certification before Defendant would provide a religious accommodation. *Id.* ¶ 40. Five to ten minutes

later, after telling him that he should continue working while she stepped away to prepare the necessary paperwork, Altman returned and immediately discharged Ford. *Id.* ¶ 41.

Having experienced this series of events within fewer than two weeks' time, Ford's belief that Defendant would terminate him if he took time off to observe religious holidays was reasonable. In fact, in view of EEOC's allegations, if he were to continue observing his religious holidays, it would have been objectively unreasonable for Ford to believe that any outcome other than termination was likely. Further, EEOC alleges that Ford did believe that termination was the only possible outcome because its Complaint states that "[Ford] *knew* Defendant would discharge him if he took time off to observe [upcoming religious] holidays," ECF No. 1 ¶ 40 (emphasis added), and when resolving this Motion to Dismiss, the Court must accept EEOC's allegation about Ford's knowledge as true. Accordingly, as pleaded in EEOC's Complaint, a reasonable person would have concluded under the circumstances that Ford's firing was inevitable, and therefore, his resignation prior to that does not impair EEOC's constructive-discharge claim.

3. **Defendant's focus on the *Clowes* factors is misplaced because they are neither factually nor legally relevant to EEOC's constructive-discharge claim as pleaded.**

While Defendant's argument concerning constructive discharge places heavy reliance on six factors that the Third Circuit described in *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010) (and which the Third Circuit originally articulated in *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993), *as amended* (May 27, 1993)), that reliance is misplaced, as the Third Circuit has made clear that the six factors discussed in *Colwell* are simply *illustrative examples* that are neither exhaustive nor relevant to all constructive-discharge claims. *See Suders*, 325 F.3d at 445 ("Our identification in *Clowes* of situations that often accompany constructive discharge was not intended to be exhaustive; rather the situations were intended 'to illustrate some of

the factors on which plaintiffs claiming constructive discharge have relied.'"); *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 168 (3d Cir. 2001) ("[I]t is important to note that we have never made the *Clowes* factors an absolute requirement for recovery. . . . The absence of the factors in *Clowes* is not necessarily dispositive."). The touchstone remains objective intolerability, and that standard can be satisfied by a multitude of circumstances in a given case.

Thus, while Defendant seeks to construct a straw man by highlighting the absence of allegations in EEOC's Complaint about demotions, transfers, altered job responsibilities, or unsatisfactory performance evaluations, these examples are simply irrelevant to the constructive-discharge claim at issue *in this case*, so their absence is of no import. Under well-established principles of law discussed in the authorities cited *supra*, EEOC's Complaint states a cognizable constructive-discharge claim, as the allegations therein indicate that Ford's working conditions were objectively intolerable.

For the reasons discussed above, EEOC has pleaded that Defendant constructively discharged Ford because of his religion and, therefore, that Defendant subjected Ford to an adverse employment action for purposes of the third element of its failure-to-reasonably-accommodate-religion claim.

### C.   Defendant subjected Ford to adverse employment action in the form of progressive discipline when it assessed absence points against him because of his observance of religious holidays, thereby marking him for termination.

In its Complaint, EEOC states that when Ford did not attend work because of his observance of religious holidays, Defendant assessed at least three absence points against him "under its attendance and progressive-discipline policy." *See* ECF No. 1 ¶ 33; *see also* ECF No. 1 ¶¶ 21, 35 (alleging assessment of points under attendance policy for absences because of religious observance). EEOC also states that under the attendance and progressive-discipline policy as it then

existed, an employee in his introductory period, like Ford, that accumulated four unexcused absence points was subject to discharge. *See* ECF No. 1 ¶ 33.

The federal courts have consistently held that assessments of points that move an employee a step closer to termination in a progressive-discipline system constitute adverse employment actions under Title VII. *See, e.g.*, *Abraham v. Potter*, 494 F. Supp.2d 141, 148–49 (D. Conn. 2007) (holding that genuine dispute of material fact existed about whether "paper" suspension constituted adverse employment action for plaintiff's Title VII disparate-treatment claims, in part, because it was second step in employer's progressive-discipline process that could have resulted in termination); *Dean v. Boeing Co.*, No. CV 05-1342-MLB, 2007 WL 9751652, at *6 (D. Kan. Jan. 25, 2007) (holding that corrective-action memorandum constituted adverse employment action for plaintiff's Title VII disparate-treatment claim because it "was not just a warning, [but] it was the second step in a three-step progressive discipline plan that could end in termination"), *aff'd*, 260 F. App'x 124 (10th Cir. 2008); *see also, e.g.*, *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224–25 (10th Cir. 2006) (stating that "[a] written warning *may* be an adverse employment action only if it effects a significant change in the plaintiff's employment status," e.g., when "the effect on the plaintiff's employment status was an immediate placement in an at-risk status"); *Younger v. Ingersoll-Rand Co.*, No. 1:12-CV-933, 2013 WL 6241591, at *6–9 (S.D. Ohio Dec. 3, 2013) (holding that genuine dispute of material fact existed about whether assessment of attendance points constituted materially adverse employment action for plaintiff's Title VII retaliation claim, including where plaintiff was "one and one-half points away from termination . . . [and] termination loomed as a real threat").

The myriad cases that Defendant cites are plainly distinguishable. In *Leitch v. MVM, Inc.*, No. 03-cv-4344, 2004 WL 1638132 (E.D. Pa. July 22, 2004), the district court held that certain

plaintiffs who had alleged *only* that they had been threatened with termination had not sufficiently pleaded adverse employment actions for their ADEA disparate-treatment claims. *Id.* at *5. In *Tunis v. City of Newark*, 84 F. App'x 140 (3d Cir. 2006), the Third Circuit held that a disciplinary charge that the appellant-employee *had successfully challenged* at a disciplinary hearing where union counsel had represented him could not support his ADEA constructive-discharge claim. *Id.* at 142–43. And in *Heuschkel v. McCulley*, 2008 U.S. Dist. LEXIS 22143 (D.N.J. Mar. 19, 2008), the district court held that a written reprimand did not constitute an adverse employment action under state law where "plaintiff does not claim that the reprimand has been used as a basis for progressive discipline*." Id.*at *11–12. In contrast to this case, none of the aforementioned decisions examined whether incremental steps on a progressive-discipline system that actually moved an employee closer to termination constituted adverse employment actions under Title VII.

Defendant also argues that mere unrealized threats of discipline or termination do not constitute adverse employment actions for purposes of EEOC's failure-to-reasonably-accommodate-religion claim, *see* ECF No. 8 at 6–7, but Defendant's argument mischaracterizes the issue in this case. This is not a threats case. EEOC does not allege that Defendant merely *threatened* Ford. Rather, EEOC alleges that Defendant did, in fact, subject Ford to both a constructive discharge and disciplinary action by assessing him points in a progressive-discipline system that materially altered his status as an employee by moving him closer to discharge under Defendant's policies.[3] Accordingly, the various "threats" decisions cited by Defendant in its Motion are entirely irrelevant to EEOC's claims in this case. *See* ECF No. 8 at 6-7 (citing *Mohammed*, 2018 WL 5634897,

---

[3] Similarly, EEOC does not allege that Defendant's so-called "investigation" of Ford's absences or the Employee Review Committee meeting itself is an adverse employment action, so Defendant's discussion on those points is inapposite. *See* ECF No. 8 at 7. Rather, EEOC alleges the actual imposition of disciplinary points in a progressive-discipline system.

at *10; *Walsh v. Irvin Stern's Costumes*, No. 05-cv-2515, 2006 WL 166509, at *6 (E.D. Pa. Jan. 19, 2006); *Bowles v. New York City Transit Auth.*, 285 F. App'x 812, 814 (2d Cir. 2008); *Vawter v. Alcoa, Inc.*, No. 4:07-cv-0019-JVB, 2008 WL 5220833, at *11–12 (N.D. Ind. Dec. 10, 2008)).[4]

Indeed, the first case that Defendant cites, even if it were pertinent, would actually support EEOC's position. In *Mohammed v. Schneider Nat'l Carriers, Inc.*, the plaintiff-employee had requested a religious accommodation that would have allowed him to complete a job-related physical examination. No. 18-cv-0642, 2018 WL 5634897, at *1 (W.D. Pa. Oct. 12, 2018), *report and recommendation adopted*, No. 2:18-cv-0642, 2018 WL 5633994 (W.D. Pa. Oct. 31, 2018). His employer refused to provide any accommodation for the physical examination and required him to pay for a second physical himself to maintain his employment. *Id.* His employer filed a motion to dismiss, arguing that its alleged threat to terminate the plaintiff if he did not pay for the second physical did not constitute an adverse employment action for his failure-to-reasonably-accommodate-religion claim. *Id.* at *2. The report and recommendation that this Court adopted found that the employer's motion to dismiss warranted denial because "[a]s the Complaint alleges, Defendant has made continued employment contingent upon Plaintiff paying for a necessary physical that is

---

[4] Furthermore, EEOC notes that even if this were a different case presenting claims predicated on threats, other courts in both the Second and Seventh Circuits have acknowledged that *realized* threats are categorically different and may constitute adverse employment actions. *See, e.g.*, *Khan v. Fed. Reserve Bank of New York*, No. 02-civ-8893-JCF, 2005 WL 273027, at *5 (S.D.N.Y. Feb. 2, 2005) ("[T]he threat of an adverse action is sufficient to meet this element of the prima facie case, provided that the plaintiff can prove that the employer is in fact intransigent and that the threatened action is causally related to the conflict between the employer's policy and the plaintiff's religion."); *Rodriguez v. City of Chicago*, No. 95 C 5371, 1996 WL 22964, at *3 (N.D. Ill. Jan. 12, 1996) ("It is nonsensical to suggest that an employee who, when forced by his employer to choose between his job and his faith, elects to avoid potential financial and/or professional damage by acceding to his employer's religiously objectionable demands has not been the victim of religious discrimination . . . ."). Courts in other circuits have held similarly. *See, e.g.*, *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 614 n.5 (9th Cir. 1988) ("The threat of discharge (or of other adverse employment practices) is a sufficient penalty.").

free for other employees who do not request religious accommodations" and stated that "[t]o allow such an ultimatum to relieve the employer of liability for failing to accommodate as a matter of law is inconsistent with the plain language and purpose of Title VII." *Id.* at *4. The Court also noted that "the case law also recognizes situations in which threats are no longer unripe, unrealized, or stand-alone," and the case at bar was such a situation. *Id.*

In this case, the Complaint reflects that Defendant issued a similar ultimatum to Ford. Defendant's vice president of human resources directed Ford to supply a formal religious-organization certification, a document that he was unable to provide and presumably is not required of other workers taking time off for nonreligious reasons, and ordered him not to take any more days off (without limitation as to reason for absence), a term and benefit of employment presumably available to others. ECF No. 1 ¶¶ 29–30.

The progressive-disciplinary points that Defendant actually assessed against Ford, as pleaded in EEOC's Complaint, were not threatened actions but the fully realized imposition of a material change in his status as an employee, moving Ford to edge of discharge, that thereby constituted an adverse employment action.

Furthermore, not only did Defendant assess progressive-disciplinary points against Ford, but in conjunction with assessing those points, O'Malley, an officer of Defendant, directed Ford *not to take any additional days off without limitation*, a fact that clearly constitutes an adverse employment action under Title VII because it negatively altered and materially diminished his terms, conditions, or privileges of employment. That is, Defendant revoked Ford's ability to take leave available to other employees because of his religion.

Defendant's characterization of EEOC's Complaint invites the Court to view EEOC's cognizable claims through many different lenses all at once and conclude that none gives a clear

picture of the adverse employment action at issue. But the adverse employment actions are plain

on the face of the Complaint. EEOC has stated that Defendant assessed Ford at least three absence

points because of his observance of religious holidays, that his next absence point would make

him subject to termination, and that he was barred from taking any further leave. *See* ECF No. 1

¶¶ 21, 33, 35. As pleaded, and consistent with caselaw, this progressive discipline constitutes an

adverse employment action under Title VII.

## II.    A failure-to-reasonably-accommodate-religion claim does not require an additional adverse employment action because the denial of religious accommodation is in and of itself an actionable unlawful employment practice.

In its Motion to Dismiss, Defendant assumes that some type of adverse employment action

beyond the denial of religious accommodation itself is necessary to state a Title VII claim in this

case. Defendant's assumption is incorrect. Under Title VII, a denial of reasonable accommodation

for religion is itself an unlawful employment practice that does not require a showing of an addi-

tional or derivative adverse employment action to state an actionable claim. In that regard, the

Third Circuit has previously stated in dictum that a denial of religious accommodation can itself

constitute an adverse employment action under Title VII. *See Storey v. Burns Int'l Sec. Svs.*, 390

F.3d 760, 764 (3d Cir. 2004). As the Third Circuit stated, "An employer's failure to reasonably

accommodate an employee's sincerely held religious belief that conflicts with a job requirement

can also amount to an adverse employment action unless the employer can demonstrate that such

an accommodation would result in undue hardship." *Id.* (internal quotation marks omitted).

While the presence of the other, obvious adverse employment actions discussed above ren-

ders a full treatment of this issue unnecessary at this juncture of the case, a limited discussion of

the issue is warranted. The reasons supporting the conclusion that a denial of reasonable accom-

modation is a standalone unlawful employment practice are concisely discussed in the five-judge

opinion dissenting from the denial of rehearing *en banc* in *Lawson v. State of Washington*, 319 F.3d 498, 499–504 (9th Cir. 2003) (Berzon, J., dissenting). That a denial of religious accommodation is itself a Title VII violation springs from the statutory text itself—namely, the definition of *religion* at 42 U.S.C. § 2000e(j), which provides that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." Thus, the definition of *religion* imposes an affirmative duty on an employer to accommodate an employee's religious observance, practice, and belief *in all instances except one*, and that lone exception occurs when the employer demonstrates that accommodating the employee's religious observance or practice would impose an undue hardship on the conduct of its business. *See Lawson*, 319 F.3d at 499–500; *see also Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 319 (3d Cir. 2008) ("[U]nder 42 U.S.C. § 2000e(j), an employer must make reasonable accommodations for its employees' religious beliefs and practices unless doing so would create an 'undue hardship' for the employer.").

Because Title VII's description of unlawful employment practices for employers contained in 42 U.S.C. § 2000e-2(a) utilizes the definition of *religion* at § 2000e(j), it follows that a contravention of this definition is also a contravention of § 2000e–2(a) and, therefore, an unlawful employment practice. Thus, it follows that a denial of religious accommodation (without a showing of undue hardship) is itself an unlawful employment practice under § 2000e–2(a)—and a cause of action under Title VII. As the Supreme Court has noted, "The intent and effect of this definition was to make it an unlawful employment practice under § 703(a)(1) for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees

and prospective employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977); *see also Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 64–65, 70–71 (1986) (declining to evaluate whether employee-respondent established prima facie case of failure to reasonably accommodate religion under Title VII where district court held that he established prima face case, including for period where he suffered no harm apart from denial of religious accommodation).

In that regard, note that the phrase *adverse employment action* does not appear in the statutory text of Title VII but, rather, is a judicial term of art that generally operates to separate significant employment actions, i.e., "discrimination" in Title VII's parlance, from insignificant ones. *See Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006). But in religious-accommodation cases, the breach of the duty to accommodate is statutorily defined as a significant employment action by the express inclusion of that affirmative duty in the Act.[5]

## CONCLUSION

For the foregoing reasons, EEOC respectfully requests that the Court enter an order denying in its entirety Defendant's Motion to Dismiss Plaintiff's Complaint.

Respectfully submitted,

/s/ Gregory A. Murray
GREGORY A. MURRAY
Senior Trial Attorney
Pa. I.D. No. 316144
EEOC – Pittsburgh Area Office
William S. Moorhead Federal Building

---

[5] The character of the duty at issue comports with this conclusion. The duty of reasonable accommodation (absent undue hardship) under the Act is not merely prohibitory in nature but instead requires employers to affirmatively make changes to the employment of covered workers. As such, reasonable accommodation is appropriately viewed as *a statutorily mandated term, condition, and privilege of all covered employment relationships*, and the fact that the duty was expressly listed in the Act by subsequent amendment indicates that Congress viewed it as significant or material. It follows, then, that when an employer unlawfully withholds that statutorily mandated term, condition, or privilege of employment, there has been a significant or material effect on the employment relationship.

1000 Liberty Avenue, Suite 1112
Pittsburgh, PA 15222
Phone: 412-588-6907
Fax: 412-395-5749
gregory.murray@eeoc.gov

DEBRA M. LAWRENCE
Regional Attorney
Baltimore, MD

RONALD L. PHILLIPS
Supervisory Trial Attorney
Baltimore, MD

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION**,

            Plaintiff,

    v.

**CENTER ONE, LLC**,

            Defendant.

Case No. 2:19-cv-1242-DSC

Hon. David Stewart Cercone

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 24, 2019, I filed a true and correct copy of the foregoing Plaintiff EEOC's Response to Defendant's Motion to Dismiss Plaintiff's Complaint with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

          Respectfully submitted,

          **For Plaintiff U.S. Equal Employment Opportunity Commission:**

          /s/ Gregory A. Murray
          GREGORY A. MURRAY
          Senior Trial Attorney
          Pa. I.D. No. 316144
          EEOC – Pittsburgh Area Office
          William S. Moorhead Federal Building
          1000 Liberty Avenue, Suite 1112
          Pittsburgh, PA 15222
          Phone: 412-588-6907
          Fax: 412-395-5749
          gregory.murray@eeoc.gov