IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION and DEMETRIUS FORD, | ) ) ) ) | 2:19-CV-01242-CCW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CENTER ONE, LLC. and CAPITAL MANAGEMENT SERVICES, L.P., | ) ) ) | |
| Defendants. | ) | |

## **OPINION**

Before the Court are cross-motions for summary judgment filed by Plaintiff U.S. Equal Opportunity Commission ("EEOC") and Intervenor Plaintiff Demetrius Ford (together, "Plaintiffs"), ECF No. 98, Defendant Center One, LLC ("Center One"), ECF Nos. 102 & 104, and Defendant Capital Management Services, L.P. ("CMS"), ECF Nos. 106 & 108.

In this case, EEOC and Mr. Ford claim that Mr. Ford's former employer, Center One, failed to accommodate Mr. Ford's religious beliefs and constructively discharged him, in violation of Title VII of the Civil Rights Act of 1964. *See generally* ECF Nos. 67 & 68 (First Amended Complaint in Intervention and First Amended Complaint, respectively). Plaintiffs sought and received leave to add Capital Management Services as a Defendant, asserting that Center One and CMS are a "single employer" for Title VII purposes. *See* ECF No. 66. Following the close of discovery, the parties filed the instant cross-motions for summary judgment.[1] For the reasons that

---

[1] The parties' briefing and statements of fact, counterstatements of fact, etc., are voluminous and, in large part, duplicative. For example, the Concise Statements of Material Fact accompanying Center One's motions, ECF Nos. 102-2 and 104-2, are identical, Center One filed a combined brief supporting both of its motions, ECF Nos. 103 and 105, and Plaintiffs filed a single joint brief in opposition, ECF No. 113. As such, in resolving the cross-motions, the Court will, in general, refer to Plaintiffs' joint motion ("Plaintiffs' Joint Motion") and supporting materials and the briefs and materials submitted in opposition thereto, ECF Nos. 98–101, 116–118, and 121–124, and Center One's

follow, the Court will grant Center One's Motions in full and deny Plaintiffs' Motion.  As a result,

we need not decide whether CMS and Center One are joint employers, and we will therefore deny

CMS' Motions as moot.

## I.    FACTS

The following facts are undisputed unless otherwise noted.

Mr. Ford practices Messianic Judaism, which requires him to abstain from work on certain

religious holidays, such as Rosh Hashanah (also known in Messianic Judaism as "Feast of

Trumpets"), Yom Kippur, and others.  *See* ECF No. 118 ¶ 33; ECF No. 120 ¶¶ 67–68.[2]  Center

One operates a "credit card company call center in Beaver Falls, Pennsylvania."  *See* ECF No. 111

¶ 7.  Mr. Ford was hired by Center One as a Customer Care Specialist on September 12, 2016.  *See*

ECF No. 118 ¶¶ 1–2.  He resigned his employment just over one month later, on October 19 or 20,

2016.  *See* ECF No. 118 ¶ 125.[3]

Throughout his five-week employment with Center One, Mr. Ford was in his "Introductory

(or Probationary) Period."  *See* ECF No. 118 ¶ 4.  Within that "Introductory Period," Mr. Ford was

---

motion for summary judgment as to the Amended Complaint ("Center One's Motion") and supporting materials and
the briefs and materials submitted in opposition thereto.  *See* ECF Nos. 102–103, 110–112, and 119–120.

[2] Center One attempts to deny, for purposes of summary judgment, that Mr. Ford is an adherent of Messianic Judaism.
*See* ECF No. 118 ¶ 33.  Center One also attempts to deny that Mr. Ford's religious belief was sincere.  *See id.* ¶ 39.
However, those denials appear to rest only on Center One's Answer to the Amended Complaint.  *See id.* ¶¶ 33, 38
(citing ECF No. 76 ¶¶ 20–21).  It is well established that "a party opposing a properly supported motion for summary
judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that
there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  Because Plaintiffs
properly support their assertion of Mr. Ford's religious beliefs, and the sincerity of those beliefs, *see* ECF No. 100 ¶¶
33 & 38, those facts are, for purposes of resolving the cross-motions, deemed to have been admitted, pursuant to
Western District of Pennsylvania Local Rule of Civil Procedure 56.  *See* LCvR 56.E;  *see also Mattis v. Overmeyer*,
Case No. 1:16-cv-00306, 2019 U.S. Dist. LEXIS 103193, at *6 (W.D. Pa. June 20, 2019) (Lanzillo, M.J.) (noting that
courts in this district "require strict compliance with the provisions of Local Rule 56.") (collecting cases);  *Hughes v.
Allegheny Cty. Airport Auth.*, Civil Action No. 15-221, 2017 U.S. Dist. LEXIS 103819, at *2 (W.D. Pa. July 6, 2017)
(Fischer, J.) (noting that that any fact claimed to be undisputed in the moving party's concise statement "'will for the
purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise
controverted by a separate concise statement of the opposing party.'") (quoting LCvR 56.E).

[3] Center One specifically maintains that Mr. Ford, in fact, resigned on October 20, 2016.  *See* ECF No. 118 ¶ 125.
However, whether Mr. Ford resigned on October 19 or October 20, 2016, is not material, and the parties do not dispute
that Mr. Ford did resign from Center One.  *See also* ECF No. 111 ¶ 53.

in his "Training Period" from September 16 through September 25, 2016, and he was in his "Transition Period" from September 26 to October 9, 2016.  *See* ECF No. 118 ¶¶ 6, 8.

### A.     Employee Handbook/Center One Attendance and Discipline Policies

During Mr. Ford's employment, Center One's Employee Handbook described its policies and procedures regarding a number of topics, including attendance and discipline.  *See* ECF No. 118-10 (the "Handbook");  ECF No. 118 ¶ 62.  The Handbook described Center One's "Point System" for attendance, advising that "[a]ttendance points are assigned when a deviation occurs to your scheduled shift" and setting forth the number of points that would be assigned for specific infractions.  ECF No. 118-10 at 67.  The points an employee could accrue for various infractions ranged from one-half point for departing work early (under certain circumstances), to one to two points for an absence (depending on the day of the week), to three points for a "No Call – No Show."  *See id.*  The parties agree that the Handbook provided for the issuance of points when an employee missed work, and that such attendance points accrued with every additional absence. *See* ECF No. 122 ¶ 131.

The Handbook sets out Center One's "disciplinary schedule (which is not progressive)" for employees in their Introductory Period, which provides that an employee would receive a first warning with the accrual of one attendance point;  a second warning at two points;  a "Final Warning/Employment Review Committee (ERC)" at three points;  and termination at four points. *See* ECF No. 118 ¶¶ 63, 66;  *see also* ECF No. 118-10 at 68.  That said, the Handbook further informs employees that "[y]ou will be terminated if you call in absent during your Training Period" and that "[y]ou will be terminated if you reach two (2) attendance points within your Transition Period.  This includes any points received during the Training Period."  ECF No. 118 ¶¶ 64–65 (quoting ECF No. 118-10 at 66).

According to the Handbook, the ERC is meant "to provide a broad spectrum and fair review of the issues that have brought an [employee] to a critical point in their employment with the company," and notes that "the goal of the ERC is to ensure that the [employee] understand[s] the importance of superior attendance, compliance, performance, and for management to ensure that all policies and procedures are being presented, communicated, and followed through properly by all departments."  ECF No. 118-10 at 61.  The parties agree that the purpose of an ERC meeting is to make an employee aware of a violation in company policy and to institute corrective practices to avoid the employee's removal from Center One, and that an ERC meeting is part of Center One's disciplinary process.  *See* ECF No. 122 ¶ 152;  ECF No. 118 ¶ 76.

The Handbook provides a variety of ways for employees to "keep attendance points low," including, for example, instructions on how to request a temporary schedule change, ECF No. 118-10 at 69, and instructs employees to submit a "Point Discrepancy Form" in order to dispute assigned attendance points.  A "Point Discrepancy Form" submitted within 14 days of the "incident date" would then be reviewed by Center One's Time and Attendance Center ("TAC") to "make a determination if attendance points are to be changed."  *Id.* at 79.

Finally, while the parties dispute the extent to which application of Center One's policies was discretionary, *see* ECF No. 122 ¶ 133, the Handbook expressly states in a section titled "Corrective Action and Acknowledgement" that in lieu of termination, if an employee "do[es] not meet these standards, the Company may, under appropriate circumstances, take corrective action, other than immediate termination."  ECF No. 118-10 at 60.  The Handbook notes that the purpose of corrective action is to formally document problems while providing the employee a reasonable timeframe to improve performance, and that corrective action may include verbal or written

warnings, and is not progressive, but may ultimately advance and lead to termination if work performance does not improve.  ECF No. 118-10 at 60–61.

### B.  Mr. Ford's Attendance Record at Center One

Before beginning work with Center One, on August 31, 2016, Mr. Ford signed a document titled "Attendance Policy" confirming that he understood Center One's Point System, and that "[a]ll employees with a total point value equal to or exceeding 4 points in their Probationary period are subject to disciplinary actions up to and including termination."  ECF No. 101-32 at 2;  ECF No. 118 ¶ 67.  On his employment application, Mr. Ford circled "no" in response to the question, "[i]s there anything which would interfere with your regular attendance and punctuality if you are offered a job with the company?"  ECF No. 118-4.[4]  Mr. Ford also signed a form indicating that, during his 90-day Introductory Period, he had no prepaid vacation or other appointments that would require him to take time off.  *See* ECF No. 111 ¶ 16.[5]  That said, Mr. Ford also testified that during his pre-employment interview, he informed Center One Human Resources Assistant Heather Altman in general terms that he would require time off to observe religious holidays:

> Q:  And what exactly did you tell Heather [Altman] about the festivals that you attend for religious purposes during the interview on August 31, 2016?
>
> A:  I told her that I have a whole bunch of festivals that I observe.  And sometimes I don't have to work—I mean I'm not allowed to work.  I kind of glossed over it like that.

ECF No. 120-1 at 31:23–32:4;  *see also* ECF No. 112-3 at 109:3–9 (Mr. Ford testifying that he did not provide Ms. Altman with any dates or range of dates during the employment interview).  Mr.

---

[4] Plaintiffs attempt to dispute that Mr. Ford "noted in his employment application to Center One that there were no matters which would interfere with his regular attendance and punctuality, and he further noted that he was available to work any shift, including weekends" ECF No. 122 ¶ 135, by stating "[o]n his employment application, Ford noted nothing about his availability for work beyond answering the discrete questions on the employment application."  *Id.*  This response, however, does not establish a dispute of fact, because the employment application and Mr. Ford's response are both clear and speak for themselves.

[5] The Court notes that Plaintiffs do not dispute that Mr. Ford signed this acknowledgment form, but they do "deny Defendants' characterization that religious holidays are 'prepaid vacation' or 'appointments.'"  ECF No. 111 ¶ 16.

Ford further testified that, in response, Ms. Altman informed him that accommodating his religious practice would be "no problem."  ECF No. 120-1 at 32:21–22.

Mr. Ford accrued the following attendance points during his employment with Center One:

| Date | Points Assessed | Total Points |
|---|---|---|
| Sept. 29, 2016 | 1 | 1 |
| Oct. 3, 2016 | 2 | 3 |
| Oct. 4, 2016 | 1 | 4 |
| Oct. 12, 2016 | 1 | 5 |
| Oct. 19, 2016 | 0.5 | 5.5 |

*See* ECF No. 118 ¶ 69.  The parties do not discuss Mr. Ford's September 29 absence;  however, Mr. Ford's time and attendance records indicate that he was "absent moving self/family."  ECF No. 104-16 at 1.  As such, that absence (and the related points) do not appear to be relevant to Plaintiffs' claims in this case.

As to Mr. Ford's absences from work on October 3 and 4, 2016, the parties dispute whether Mr. Ford provided advance notice to Center One, or if he only called off the "day of."  *See* ECF No. 120 ¶ 68;  ECF No. 122 ¶ 141.  On this point, Mr. Ford testified that he approached Ms. Altman "one or two days before my High Holy Days – before Feast of Trumpets actually started" to inform her that "I just found out that I have two – that I have Feast of Trumpets and I cannot work" in order to learn which "code" to use when calling in to Center One's attendance hotline to report his absences.  ECF No. 112-3 at 109:21–22 and 110:5–9.  In any case, there does not appear to be any genuine dispute that Mr. Ford did not inform his direct supervisor, Shawnrika Vaughn, or submit

any written advance request for time off, and instead only utilized Center One's attendance hotline to report on October 3 and 4, 2016 that he would be absent from work for "personal" reasons. *See* ECF No. 122 ¶ 142. And, when Mr. Ford returned to work, Ms. Altman informed Mr. Ford that his October 3 and 4 absences were unexcused and that he had accrued attendance points. *See* ECF No. 111 ¶ 32.

Next, the parties do agree that at least as of October 7, 2016—after he had accrued attendance points for missing work on October 3 and 4—Mr. Ford informed Ms. Vaughn, and Center One Human Resource Generalist Andrea Brugos (née Robel) that he required time off to observe religious holidays. *See* ECF No. 118 ¶ 46. On October 7, Ms. Vaughn completed an "Employee Evaluation Form" for Mr. Ford, checking boxes indicating he was "meet[ing] requirements" in various work categories and noting at the bottom of the form, "New Agent that's still in transition. The reason for the points – Religious Holidays. His proof to give to HR." ECF No. 101-33; ECF No. 118 ¶ 70. That same day, Mr. Ford also received notice that he was requested to attend an Employment Review Committee ("ERC") meeting on October 12, 2016 in light of his absences from work on October 3 and 4, 2016. ECF No. 122 ¶ 151.

In response to learning that Mr. Ford required time off and/or schedule modifications to observe religious holidays, Ms. Brugos informed Mr. Ford that he would be required to submit a letter from his congregation, on "official letterhead" specifying the days and times he needed to abstain from working. *See* ECF No. 111 ¶ 45; *see also* ECF No. 118 ¶ 52. Mr. Ford was unable to provide such documentation, because his congregation had recently dissolved and he could not reach his former congregation's leader. *See* ECF No. 111 ¶ 46; *see also* ECF No. 118 ¶ 52. As a substitute, Mr. Ford provided Center One with (1) a calendar of Jewish holidays that he printed from the internet, (2) an e-mail from the leader of a congregation he was considering joining,

although this e-mail did not specify the days and/or times Mr. Ford would need to abstain from working, and (3) a calendar from his potential new congregation. *See* ECF No. 118 ¶¶ 53–54; ECF No. 111 ¶ 48;  ECF No. 118-13 at 2;  ECF No. 123-9 at 3–5.  According to an e-mail Mr. Ford submitted to Center One, the leader of the congregation he was considering joining would not provide an official letter until Mr. Ford joined the congregation, *see* ECF No. 111 ¶ 47;  *see also* ECF No. 118-23, and it appears that Mr. Ford never did join the new congregation.  *See* ECF No. 118-5 at 123:23–25.

The parties dispute the significance of Center One's requirement that Mr. Ford submit documentation on "official letterhead."   Plaintiffs maintain that Center One's "letterhead" requirement was inflexible and both backward- and forward-looking;  that is, that Center One would not provide any accommodation for Mr. Ford's observance of past or future religious holidays absent an official letter from his congregation leader.  *See* ECF No. 99 at 14–16  Center One, on the other hand, contends that an official letter was only necessary to excuse Mr. Ford's prior absences and remove the points he accrued for October 3 and 4, for which, as noted above, Center One maintains Mr. Ford did not seek pre-approval.  *See* ECF No. 117 at 9–10.  Further, Center One states that the calendar provided by Mr. Ford likely would have been sufficient under its policies to justify future excused absences.  *See id.* at 13.  While the record is unclear as to what, exactly, Ms. Brugos (and other Center One employees) told Mr. Ford was the reason for the letterhead requirement, *see* ECF No. 118 ¶ 47;  *see also* ECF No. 118-5 at 74:1–8 (Mr. Ford testifying that Ms. Brugos asked for an official letter in connection with an "unexcused absence"), contemporaneous e-mail correspondence between Center One employees supports Center One's version—namely, that an official letter was requested to support clearing the points associated Mr. Ford's earlier absences, and that Center One employees were in the process of determining whether

the e-mail from Mr. Ford's potential new congregation leader and calendar would be sufficient to excuse future absences. *See* ECF No. 118-13. And, the parties agree that, at least as to supporting future requests for time off for religious, the calendars and e-mail from Mr. Ford's potential new congregation would have sufficed. *See* ECF No. 118 ¶¶ 58–60.

Mr. Ford received approval for a change to his schedule for October 11, and was absent from work on October 12. Regarding October 11, Mr. Ford discussed his need for a schedule change in advance with Ms. Vaughn on October 5, completed and submitted the appropriate Temporary Schedule Change Form that same day, and his request was approved. *See* ECF No. 122 ¶¶ 145–47. The parties do not directly address what steps, if any, that Mr. Ford took (beyond his earlier submission of a calendar of religious holidays to Ms. Brugos) related to seeking prior approval for his absence on October 12. *See* ECF No. 122 ¶ 148. In any event, Mr. Ford appears to have accrued one point for the October 12 absence. *See* ECF No. 118 ¶ 6

Also on October 12, 2016, Mr. Ford attended a meeting of the ERC. ECF No. 118 ¶ 73. In attendance at the ERC meeting were at least Mr. Ford, Ms. Brugos and CMS employee Patti Sue O'Malley. ECF No. 118 ¶¶ 21, 74. The purpose of the meeting was to discuss the attendance points Mr. Ford had accrued, and for which Center One maintains Mr. Ford did not seek or obtain appropriate approval, instead of calling off "day of." ECF No. 111 ¶ 42. The parties' accounts of the meeting differ, with Mr. Ford's testimony describing a more adversarial picture than that of Ms. Brugos; however, the parties do not meaningfully dispute that the status of Mr. Ford providing an official letter was discussed, that Mr. Ford indicated he was still unable to contact his former congregation leader, and that Mr. Ford represented he was continuing to work on obtaining the

requested documentation.  *See* ECF No. 111 ¶ 50;  ECF No. 118 ¶ 75.[6]  Finally, the parties agree that no one told Mr. Ford during the ERC meeting that he would be fired if he missed another day of work.  ECF No. 122 ¶ 154.

Mr. Ford resigned his employment with Center One on October 19 or October 20, 2016. ECF No. 118 ¶ 125.  When he resigned, Mr. Ford stated that the reason he was resigning was because he could not provide the clergy or religious-group certification that Center One had requested.  *See id.* ¶ 126.  At time he resigned, Mr. Ford believed that Center One would soon terminate him because he had upcoming religious holidays and he believed that Center One continued to insist on a clergy or religious-group certification that he could not provide.  *See id.* ¶ 127.

Mr. Ford testified as follows about his resignation from Center One:

Q:  Please tell me about the circumstances of your separation.
A:  First time that I took off High Holy Days, and everybody – I was getting pressured about letterhead, I figured that I would work with someone, because I didn't want to get fired.  I loved the company.  The company is a good company. Once I got to the ERC meeting, my feeling was that I was going to be fired the next time I had another day off.  That was my feeling.  And I knew – once I looked at the High Holy Days myself, and I looked at the calendar, I knew that I had another

---

[6] The Court notes that, in a brief, Plaintiffs contend that Center One cannot rely on Ms. Brugos' written statement "because, when offered by Defendants, it is hearsay to which no exclusion or exception applies."  ECF No. 121 at 4 n.4.  Plaintiffs are incorrect.  In the Third Circuit, a district court may consider hearsay evidence when resolving a motion for summary judgment if that evidence can be put into admissible form for trial.  *See FOP v. City of Camden,* 842 F.3d 231, 238 (3d Cir. 2016) ("'[T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial.'") (citation and emphasis omitted).  While Center One may not be able to offer Ms. Brugos' written statement itself, the content of the statement—i.e., Ms. Brugos' recollection of the meeting—can come in through the testimony of Ms. Brugos herself.  Indeed, the relevant portions of Ms. Brugos' deposition testimony—which Center One does rely on for summary judgment purposes— appear to be largely consistent with her written statement.  Furthermore, any statement of Mr. Ford's recounted by Ms. Brugos, if offered against Plaintiffs, would constitute an opposing party's statement under Fed. R. Evid. 801(d)(2).  Accordingly, the Court may, as it deems appropriate, consider Ms. Brugos' written statement when resolving either Plaintiffs' Motion or Center One's Motion.  Finally, Plaintiffs do not meaningfully dispute either Ms. Brugos' written statement or testimony that Mr. Ford represented he was continuing to work on obtaining the requested letter, as Plaintiffs' denial only asserts that "[a]s of the ERC meeting on October 12, 2016, [Ms.] Brugos and [Ms.] O'Malley knew that [Mr.] Ford was unable to contact the leader of his former congregation." ECF No. 111 ¶ 50.  In other words, whether or not Ms. Brugos and Ms. O'Malley knew Mr. Ford had, to that point, been unable to contact his former congregation leader, Plaintiffs do not dispute that Mr. Ford represented he was continuing to work on obtaining an official letter specifying the dates and times of his religious holidays.

two days coming up for I believe it was – I can't remember exactly.  But I knew I had two more High Holy Days I had to take off work.  So like I said, at the ERC meeting my feeling was everyone wanted to get this letterhead.  That if I did take off, I would be getting fired.  Because of the points I accumulated. . . .  So when I did – like I said, once I found out that I knew for sure I had two more days that I couldn't work, that is when I decided to go in and talk to Heather.  And so I didn't get fired, and it be on my record, I would rather just finish up the week and get a paycheck and go home.

ECF No. 118-5 at 89:4 –90:10.  Center One accepted Mr. Ford's resignation.  ECF No. 118 ¶ 128; ECF No. 122 ¶ 173.  Plaintiffs acknowledge that as of the day of Mr. Ford's resignation, October 19 or 20, 2016, Center One had assessed him at least four attendance points but had not terminated him.  ECF No. 122 ¶ 132.  Plaintiffs also acknowledge that Center One did not expressly threaten Mr. Ford with discharge or urge him to resign, and that Center One did not change his position or pay, suspend him from employment, or demote him.  ECF No. 122 ¶¶ 160, 161, 172.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 170 (3d Cir. 2017) (internal citations and quotations omitted).  "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Razak v. Uber Techs., Inc.,* 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson*, 477 U.S. at 248).

The burden to establish that there is no genuine dispute as to any material fact "remains with 'the moving party regardless of which party would have the burden of persuasion at trial.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (quoting *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987)).  That said, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'"  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, summary judgment "requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted).  But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor…to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal citations and quotations omitted).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof

at trial," Rule 56 requires the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23; *Jakimas v. Hoffman La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

"Where, as here, cross-motions for summary judgment are filed, 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Reynolds v. Chesapeake & Del. Brewing Holdings, LLC*, Civil Action No. 19-2184, 2020 U.S. Dist. LEXIS 83633, at *6 (E.D. Pa. May 12, 2020) (quoting *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016)).

## III.    DISCUSSION

As discussed in more detail below, Plaintiffs' claims turn on whether Mr. Ford was unlawfully disciplined for absences on days his religion required him to abstain from work and whether the application of Center One's policies imposed conditions on Mr. Ford that were so intolerable that he was forced to resign.  That is, although the parties do not dispute the content of Center One's Handbook, its attendance policy, points system, and discipline system, as described above, or the number of attendance points Mr. Ford accrued, they do dispute the implications of those documents and practices with respect to Mr. Ford.

Plaintiffs assert that Center One subjected Mr. Ford to two adverse employment actions for abstaining from work on Messianic holidays:  "(1) progressive discipline in the form of attendance points that placed him at the brink of termination and (2) constructive discharge."  ECF No. 99 at 9.  Center One responds that Mr. Ford's accrual of sufficient attendance points under its policy— which was sufficient to subject him to disciplinary action up to and including termination—did not, in fact, lead to any tangible employment action against him, and specifically, that Mr. Ford

was not, in fact, terminated when he reached the threshold number of attendance points to be eligible for termination. *See, e.g.* ECF No. 118 ¶ 63, 65–67, 69, 72. Rather, Center One asserts that its policy allowed for flexibility and discretion based on the circumstances of any particular case, and that with respect to Mr. Ford, at the time he voluntarily resigned, Center One was still evaluating his request to excuse certain attendance points for religious observance. ECF No. 118 ¶ 72. Plaintiffs, on the other hand, contend that Defendants' assessment of attendance points to Plaintiff constituted progressive discipline that "placed Ford on a path to and at immediate risk of termination," which in Plaintiffs' view was sufficient to constitute an adverse employment action. ECF No. 99 at 12.

Finally, before turning to the substance of the parties' motions, we address the parties' dispute regarding the reasonableness of Center One's request for documentation to support Mr. Ford's accommodation request. *See, e.g.,* ECF No. 99 at 15; ECF No. 103 at 10. Courts in this circuit "do not charge employers with possessing knowledge about the particularized beliefs and observances of various religious sects." *Wilkerson v. New Media Tech. Charter Sch., Inc*., 522 F.3d 315, 319 (3d Cir. 2008). "That is because '[a] person's religion is not like [her] sex or race[,]' that is, simply announcing one's belief in a certain religion, or even wearing a symbol of that religion (i.e., a cross or Star of David)" is insufficient on its own to notify an employer "of the particular beliefs and observances that the employee holds in connection with her religious affiliation." *Id.* (quoting *Reed v. Great Lakes Cos.*, 330 F.3d 931, 935–36 (7th Cir. 2003)). As such, according to the EEOC Compliance Manual, an employer is generally permitted to seek "additional supporting information" where the employer "has an objective basis for questioning either the religious nature or the sincerity of a particular belief or practice." EEOC Compliance Manual, § 12-I-A-3 (2008); *see also id.* at § 12-IV-A-2 (discussing interactive process between

employer and employee in finding reasonable accommodation and noting "[w]here the accommodation request itself does not provide enough information to enable the employer to make a determination, and the employer has a bona fide doubt as to the basis for the accommodation request, it is entitled to make a limited inquiry into the facts and circumstances of the employee's claim that the belief or practice at issue is religious and sincerely held, and that the belief or practice gives rise to the need for the accommodation.").

Here, Center One concedes the religious nature of Mr. Ford's request and that, at least as of October 7, 2016, it had notice of his need for an accommodation.  *See* ECF No. 117 at 9–10. As noted above, Mr. Ford informed Ms. Altman during his pre-employment interview that he would, from time to time, need to be absent from work to observe religious holidays.  He also indicated on various pre-employment forms and paperwork that he would not require time off during his probationary period.  Plaintiffs dispute that these pre-employment forms sought information about religious observances, given their references to "prepaid vacation" and "appointments," but that dispute ultimately misses the mark because, even accepting Mr. Ford's self-serving testimony about informally alerting Ms. Altman in advance of his October 3 and 4 absences, the record is clear that Mr. Ford did not provide Center One with any detailed information—i.e., dates and times—about his need for time off for religious observances until after he had accrued attendance points for his absences on October 3 and 4.  Next, the documentation submitted to Center One by Mr. Ford and Mr. Ford's own testimony further supports Center One's request for clergy verification, as both Mr. Ford's e-mail to the leader of the congregation he was considering joining and his testimony make clear that (1) Mr. Ford was unsure of the precise dates and times his faith required him to abstain from working and (2) he required a pastor or congregation leader to confirm for him the dates and times of Messianic festivals.  *See*, *e.g.,* ECF

No. 118-5 at 98:3–6 (explaining "[t]hat is why we always need a priest, or somebody else that is more knowledgeable, that can guide us through the days and the times of our High Holy Days."); ECF No. 118–23 (e-mail from Mr. Ford requesting from leader of congregation "a letter head explaining the High Holy days starting with Oct. 2nd and the rest of this month[] stating the days that I will not be permitted to work.").  And, finally, the dates and times on the calendar Mr. Ford obtained from the internet and the congregation he was considering joining also did not necessarily match up with the dates and times Mr. Ford's sect observed certain holidays.  *See* ECF No. 118-5 at 122:1–7 ("Q:  The date for Rosh Hashanah is listed Monday, October 3, 2016.  Do you recall you observed Rosh Hashanah on that date?  A:  No.  Because this is a Jewish Calendar.  Q:  So did you observe any of the holidays listed on this calendar?  A:  Yes.  But not on these dates.");  *see also id.* at 123:23–25 ("Q:  What was the reason you didn't join them [the potential new congregation]?  A:  Because there is a couple holidays they celebrate that we are taught not to celebrate.").

   In short, given the lack of specific information provided by Mr. Ford leading up to his October 3 and 4 absences and Mr. Ford's own uncertainty as to the days and times he was required to abstain from working, Center One sought supplemental information to ascertain the specific contours of any reasonable accommodation.  And, while Center One may not ultimately have been able to insist on clergy verification, the evidence here shows that Mr. Ford represented to Center One that, as part of the interactive process, he was continuing to try to obtain the requested letter.  *See, e.g.,* ECF No. 111 ¶ 50.  As such, the Court concludes that Center One's request was reasonable under the circumstances.

A.      **Title VII Failure to Accommodate Religion**

1.      **Legal Standard for Religious Accommodation Claim**

Title VII of the Civil Rights Act of 1964 makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . . religion." 42 U.S.C. 2000e-2(a)(1).  To establish a prima facie case of a failure to accommodate religious practice, an employee must show that:  (1) he "holds a sincere religious belief that conflicts with a job requirement";  (2) he "informed his employer of the conflict;"   and (3) he "was disciplined for failing to comply with the conflicting job requirement." *Groff v. DeJoy*, 35 F.4th 162, 168 (3d Cir. 2022) (citing *EEOC v. GEO Grp., Inc*., 616 F.3d 265, 271 (3d Cir. 2010);  *Vaynshelboym v. Comhar, Inc.*, Civil Action No. 20-2690, 2021 U.S. Dist. LEXIS 183968, at *15 (E.D. Pa. Sept. 27, 2021).  If an employee establishes a prima facie case, "'the burden shifts to the employer to show either it made a good-faith effort to reasonably accommodate the religious belief, or such an accommodation would work an undue hardship upon the employer and its business.'"  *Groff*, 35 F.4th at 169 (quoting *Webb v. City of Phila.*, 562 F.3d 256, 259 (3d Cir. 2009);  *Vaynshelboym*, 2021 U.S. Dist. LEXIS 183968, at *15– 16.

2.      **Mr. Ford Did Not Suffer an Adverse Employment Action within the Meaning of Title VII**

The viability of Plaintiffs' claim for failure to accommodate religious practice turns on whether Mr. Ford suffered an adverse employment action sufficient to satisfy the third element of Plaintiffs' prima facie case.  Center One argues that merely accruing attendance "points" and being required to attend the October 12, 2016, ERC meeting is insufficient and, therefore, Plaintiffs' claim must fail.  *See* ECF No. 103 at 5–6.  Plaintiffs disagree.  *See* ECF No. 110 at 2–3 (acknowledging that "hypothetical future progressive discipline" would not be sufficient to meet

the third element, but contending that "the evidence shows that Defendants had an established progressive-discipline system, that they subjected Ford to progressive discipline under that system in the form of attendance points, and that under Defendants' established system, those points changed Ford's status as an employee by bringing him to the brink of discharge.").

Courts in this Circuit have equated "discipline" in the context of a religious accommodation claim with "adverse employment actions." *Vaynshelboym*, 2021 U.S. Dist. LEXIS 183968, at *16 (internal quotations omitted) (citing cases). This understanding comports with the plain language of Title VII. *See, e.g. Storey v. Burns Int'l Security Services*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting 42 U.S.C. § 2000e-2(a)(1) (adverse employment element "stems from the language of Title VII itself" making it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment"). Thus, to satisfy the third element of their prima facie case, Plaintiffs must show discipline "that is serious and tangible enough to alter [the] employee's compensation, terms, conditions, or privileges of employment." *Vaynshelboym*, 2021 U.S. Dist. LEXIS 183968, at *16 (internal quotations omitted) (citing cases); *see also Mieczkowski v. York City Sch. Dist.*, 414 F. App'x 441, 445 (3d Cir. 2011).

Applying this standard, the Court finds that Plaintiffs cannot satisfy the third element of the prima facie case because the alleged adverse actions did not materially alter the compensation, terms, privileges, or conditions of Mr. Ford's employment. As a threshold matter, Plaintiffs concede that this case does not involve "termination, pay reductions, demotions, transfers, promotion denials, criticism, reprimands, or threats." ECF No. 110 at 2. Next, Defendants do not dispute that they had a discipline system, or that they assessed Mr. Ford attendance points in September and October of 2016. *See* ECF No. 118 ¶¶ 68–69. But they deny that the accrual of attendance points by Mr. Ford resulted in any tangible adverse employment against him. ECF No.

118 ¶ 69 (citing to Mr. Ford's deposition, ECF No. 118-5, at 92:17 & 189:9–12).  This leaves Plaintiffs with the theory that the issuance of attendance points to Mr. Ford, which they assert brought him "to the brink of discharge," constituted adverse actions because points were "steps in the progressive discipline process" that are "signposts on a predetermined path to a true adverse employment action" which themselves constitute adverse employment actions.  ECF No. 99 at 10.

The problem with Plaintiff's theory, however—which appears to rely entirely on case law from outside this circuit, *see* ECF No. 99 at 9–11—is that, even if we view the attendance points as progressive discipline as Plaintiffs assert, merely assigning points, without more, does not constitute adverse employment action within the meaning of Title VII.  *See, e.g.*, *Deans v. Kennedy House, Inc.*, 998 F.Supp. 2d 393, 410–11 (E.D. Pa. 2014) (finding that verbal and written warnings, docking of pay, and adoption of an adjusted work schedule do not constitute adverse employment actions in a Title VII discrimination case, and stating that although the warnings were disciplinary in nature and "were part of a progressive discipline schedule, and thus may have remained in [plaintiff's] personnel record and could conceivably in the future form the basis for an adverse action, the two warnings here did not lead to [plaintiff's] termination, nor did they otherwise affect the compensation, terms, conditions or privileges of his employment.").  Similarly, the fact that, in light of this accrual of attendance points, Mr. Ford was required to attend an ERC meeting does not constitute an adverse employment action.  *See, e.g.*, *Heasley v. Echostar Satellite L.L.C.,* No. 8-261, 2009 U.S. Dist. LEXIS 45035 (W.D. Pa. May 22, 2009) (Ambrose, J.) (meeting between plaintiff, her supervisor and second-level supervisor at company conference room, after plaintiff had received written reprimand, and during which she was not permitted to have a break or an HR representative, was not adverse employment action for purposes of Title VII discrimination claim, even though "the meeting made plaintiff severely upset, and 'break down emotionally,'" because

it did not materially alter any aspect of plaintiff's employment.).  Indeed, the parties agree that, although part of Center One's disciplinary process, an ERC meeting is meant to make an employee aware of a violation in company policy and to institute corrective practices to avoid the employee's removal from Center One.  *See* ECF No. 122 ¶ 152;  ECF No. 118 ¶ 76.

Furthermore, had Center One rigidly applied its Handbook policy, Mr. Ford was not merely at the "brink" of termination—he had already fallen off the cliff.  Before completing his "Transition Period," Mr. Ford had accrued four attendance points, which was double the number needed for termination at the time for an employee in his or her Introductory Period.  *See* ECF No. 118 ¶ 8 (Mr. Ford's transition period ran from September 26 to October 9, 2016);  *id.* ¶ 65 (quoting Handbook as stating:  "You will be terminated if you reach two (2) attendance points within your Transition Period.  This includes any points received during the Training Period.");  and *id.* ¶ 69 (showing Mr. Ford had accrued four points as of October 4, 2016).  He accrued further attendance points on October 12 and October 19.  Yet, the undisputed record evidence shows that Center One did not take any action to materially discipline, let alone terminate, Mr. Ford, beyond assigning him attendance points and requiring his presence at an ERC meeting.  Furthermore, no one at the ERC meeting expressly threatened Mr. Ford with termination or suggested he resign;  instead, Mr. Ford testified that he was only warned against taking any further *unexcused* absences.  Indeed, the parties do not dispute that Center One approved Mr. Ford's request for a schedule modification for religious purposes for October 11.  *See* ECF No. 122 ¶¶ 146–47.

Accordingly, taking the undisputed facts in the light most favorable to Plaintiffs, the Court concludes that a reasonable jury could not find that Mr. Ford suffered an adverse employment action and, consequently, Plaintiffs cannot sustain a prima facie case of failure to accommodate religious practices.  Therefore, Center One's Motions will be GRANTED and Plaintiffs' Motion

will be DENIED with respect to Count I of the Amended Complaint and Count I of the Amended

Complaint in Intervention.  *See* ECF Nos. 67–68.

### B.    Title VII Constructive Discharge

Having determined that Mr. Ford did not suffer an adverse employment action sufficient

to sustain Plaintiffs' claims for failure to accommodate religious practice, we now turn to whether

Mr. Ford was constructively discharged.  If so, such constructive discharge would satisfy the

adverse employment action requirement for element three of Mr. Ford's prima facie case.  *See*

*Mieczkowski v. York City School District*, 414 F. App'x 441, 445 (3d Cir. Feb. 18, 2011) (citing

*Hill v. Borough of Kutztown*, 455 F.3d 225, 247 n.32 (3d Cir. 2006)) ("Certainly, a constructive

discharge, if it occurred, constitutes an adverse employment action.").

### 1.    Legal Standard for Constructive Discharge

The Third Circuit has repeatedly held that constructive discharge occurs where "the

employer knowingly permitted conditions of discrimination in employment so intolerable that a

reasonable person subject to them would resign."  *Lanza v. Postmaster General of the U.S.*, 570

F. App'x 236, 240 (3d Cir. 2014) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)).

Whether a constructive discharge has occurred is measured against an objective standard.  *Lanza*,

570 F. App'x at 240 (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013)).

The harassment inflicted upon the employee "must be severe and pervasive, even more so than

that required to prove a hostile work environment."  *Lanza*, 570 F. App'x at 240 (citing *Spencer*

*v. Wal-Mart Stores, Inc.*, 469 F. 3d 311, 316 n.4 (3d Cir. 2006)).  An employee's subjective

perceptions of harshness or unfairness do not govern a claim of constructive discharge.  *Mandel*,

706 F. 3d at 169 (citing *Gray v. York Newspapers, Inc.*, 957 F. 2d 1070, 1083 (3d Cir. 1992)).

Considerations relevant to evaluating a claim of constructive discharge include "whether the

employer (1) threatened the employee with discharge or urged or suggested that she resign or retire, (2) demoted her, (3) reduced her pay or benefits, (4) involuntarily transferred her to a less desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job evaluations." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010) (internal quotation marks and alterations omitted) (citing *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993)).

### 2.  Mr. Ford Was Not Constructively Discharged

Mr. Ford worked for Center One for approximately five weeks and the events relevant to summary judgment took place over a period of approximately two to three weeks.  Applying the *Clowes* factors, there is no evidence that Mr. Ford was threatened with discharge;  demoted; subject to a reduction of pay or benefits; transferred to a less desirable position or altered job responsibilities;  or urged to resign. *Clowes*, 991 F. 2d at 1161; *see also* ECF No. 122 ¶¶ 160, 172.

Nor can Mr. Ford's perceptions—specifically about the likelihood of discharge, or more generally about his job situation—govern his claim of constructive discharge. *Gray v. York Newspapers, Inc.*, 957 F.2d at 1083.  Here, Mr. Ford testified that:

> Once I got to the ERC meeting, my feeling was that I was going to be fired the next time I had another day off.  That was my feeling.  And I knew – once I looked at the High Holy Days myself, and I looked at the calendar, I knew that I had another two days coming up for I believe it was – I can't remember exactly.  But I knew I had two more High Holy Days I had to take off work.  So like I said, at the ERC meeting my feeling was everyone wanted to get this letterhead.  That if I did take off, I would be getting fired.  Because of the points I accumulated. . . .

ECF No. 118-5 at 89:4–90:1.  "The law of constructive discharge" however 'is not concerned with subjective fears of possible future dismissal." *Tunis v. City of Newark*, 184 F. App'x 140, 143 (3d Cir. 2006) (citing *Gray*, 957 F.2d 1070 at 1082).

Alternatively, Plaintiffs assert the viability of an "inevitable termination" theory of constructive discharge—which Plaintiffs contend is "a species of intolerable working

conditions"—such that a plaintiff's claim can succeed in the case where "an employer act[s] in a manner so as to communicate to a reasonable employee that he will be terminated," and the employee resigns.  ECF No. 99 at 18–19;  *see also Matos v. PNC Financial Services Group*, No. 03-5320 (RBK), 2005 U.S. Dist. LEXIS 24529, at *13–14 (D.N.J. Oct. 17, 2005).  Here, Plaintiffs contend that "[t]he undisputed evidence shows that Ford's termination was forthcoming, and any resignation by Ford was prompted by Defendants' actions and policies." *Id.* at 21.  In other words, Plaintiffs contend that a reasonable employee in Mr. Ford's position would have concluded from the combination of Center One's written policies and the communications he or she had with Center One personnel, that his or her termination was imminent.  This "inevitable termination" theory does not appear to have been expressly endorsed by the Third Circuit, and, in any event, the cases cited by Plaintiffs in support of its application here, *see* ECF No. 99 at 21–22, are distinguishable on their facts.

For example, Plaintiffs point to *Shepard v. Gannondale*, in which the plaintiff, a practicing Jehovah's Witness, claimed she was constructively discharged after she refused to attend certain meetings.  , Civil Action No. 1:14-cv-8, 2014 U.S. Dist. LEXIS 176822, at *3, *38 (W.D. Pa. Dec. 22, 2014).  In that case, plaintiff testified that she was told by her manager "that if she could not participate in community meetings, she was not part of [the company];  that she asked [her manager] if she was being let go and [manager] told her she should resign but she refused;  and that [manager] gave [plaintiff] the options of leaving right then, tendering her notice or staying until a replacement was hired." *Id.* at *39.  After that meeting, plaintiff's manager "sent a message out that [plaintiff] was leaving, posted her job and hired a replacement for her." *Id.*  On these facts, the court held that "under these circumstances, a reasonable jury could conclude that [manager] either terminated [Plaintiff] on May 23, 2013 [the date of the meeting] or communicated to her

that she would be terminated once her replacement was hired and then she resigned on June 13, 2013 just before she would have been terminated." *Id.* As noted previously, Center One employees never communicated a threat of termination to Mr. Ford prior to his resignation and, furthermore, there is no evidence they told others at the company that Mr. Ford was leaving or had been replaced.

Plaintiffs also cite to *Young v. Southwestern Savings. & Loan Ass'n,* 509 F.2d 140 (5th Cir. 1975). In that case, the plaintiff, a bank teller, objected to attending the portion of certain company meetings committed to "devotionals"—which consisted of "a short religious talk and a prayer, both delivered by a local Baptist minister" at the outset of each meeting—because she was an atheist. *See id.* at 141–42. Plaintiff's supervisor informed her the meetings were mandatory and that, if she did not like the "devotionals," she could "'close [her] ears.'" *Id.* at 142. Later that day, Plaintiff informed her manager that "she was checking out her cash drawer, turning in her keys and leaving Southwestern" because "she could not attend the 'prayer meetings.'" *Id.* Her manager asked for a letter of resignation, "but she refused, saying, 'No, I am being fired.'" *Id.* Importantly, the "accommodation" offered in *Young* was no accommodation at all, as plaintiff's employer mandated that plaintiff engage in conduct that violated her conscience, which is not the case here; furthermore, no Center One employee ever asked for Mr. Ford's resignation.

Finally, Plaintiffs also discuss *Matos v. PNC Financial Services Group*, 2005 U.S. Dist. LEXIS 24529. In that case, the plaintiff, a Jehovah's Witness like plaintiff in *Shepard,* requested time off to attend a religious convention, which her supervisor denied and, further, informed plaintiff that if she attended the conference she would be fired for insubordination. *Id.* at *5. In refusing the requested accommodation, plaintiff's manager asked her, "What is more important to you, your job or God?" *Id.* Plaintiff resigned later that day. *Id.* Given the employer's threats of

discharge, the court found a material issue of fact existed regarding constructive discharge. Plaintiffs note that in *Matos*, "the threat of termination was sufficient to show constructive discharge" and then assert that here, "Defendants assessed attendance points against Ford, thereby threatening imminent termination under their discipline policy."   ECF No. 99 at 22.   Again, however, Plaintiffs agree that "Defendants did not expressly threaten Ford with discharge or urge him to resign, and did not change his position or pay," which stands in stark contrast to defendant's conduct in *Matos*.   ECF No. 122 ¶ 160;  *see also* ECF No. 110 at 2.

In each of the cases discussed above, the plaintiff's termination at the time she resigned was a *fait accompli*;  in other words, a reasonable employee in each situation would have understood that her employer was requiring her to choose between her job and her faith.   That is not the case here.   No Center One employee threatened Mr. Ford with termination or told him he would be terminated for observing religious holidays;  rather, as Mr. Ford himself testified, Center One employees only warned him against future *unexcused* absences.   A reasonable employee in Mr. Ford's position, given Center One's undisputed accommodation of his schedule change on October 11, would have understood that directive to mean he or she must follow company procedure before taking future absences from work.

Nor can Plaintiffs succeed with their argument that Center One's "official letterhead" requirement made Mr. Ford's termination inevitable, because only Mr. Ford's subjective beliefs support the conclusion that Center One would have ultimately terminated him if he failed to produce such a letter.   Once informed of Center One's request for the letter, Mr. Ford repeatedly told Center One employees that he was trying to secure such documentation.   Then, within a week of his return after the ERC meeting and apparently before informing Center One of his conclusion that obtaining a letter was impossible, Mr. Ford resigned.   There is no evidence that there was any

further discussion about the "official letterhead" request between October 12 and the date of Mr. Ford's resignation, whether initiated by Center One or Mr. Ford.  Nor is there any evidence that Mr. Ford submitted any request for a schedule change or to be absent from work to observe any future religious holidays after the October 12 ERC meeting without first providing a letter.  In short, Mr. Ford's subjective belief about what Center One would do without an official letter—a belief contradicted, at least in part, by Center One's accommodation of his schedule change request for October 11—and his resulting preemptive resignation, cut off any effort Center One was making to accommodate his religious practices.  In other words, while Center One's policy in 2016 appears to have required that Mr. Ford produce a letter, that policy was also flexible;  indeed, even though Mr. Ford had accumulated sufficient points before the end of his Transition Period, such that, under the policy, he should have been terminated twice over, Center One refrained and continued to work with him.  A reasonable employee in Mr. Ford's position would have at least continued to communicate with Center One once it became apparent that no letter—whether from his former or prospective congregation—could be produced.  Mr. Ford's unilateral decision to cut that process off, based only on his subjective feeling about what Center One intended to do, cannot support a claim for constructive discharge.

In sum, therefore, a reasonable jury viewing the evidence in the light most favorable to Plaintiffs could not conclude that Mr. Ford was subjected to a work environment that was so objectively intolerable that a reasonable worker in his position would have resigned.  Accordingly, Center One's Motions will be GRANTED and, for the same reason, Plaintiffs' Motion will be DENIED.

**IV.      CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion will be DENIED and Center One's Motions will be GRANTED, and Plaintiffs' claims will be dismissed.  Finally, because Plaintiffs' claims will be dismissed, we need not reach CMS' Motions, and those will be DENIED as MOOT.

DATED this 19th day of August, 2022.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record